UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                            Case No. 20-CR-79-002-LJV-JJM

SEMAJ PIGRAM,

                Defendant.

## ATTORNEY DECLARATION

        I, ROBERT C. SINGER, ESQ., make this Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

        1.      I am an attorney at law duly licensed to practice in the State of New York and this Court and am Owner of Singer Legal PLLC.  By appointment under the Criminal Justice Act, I am defense counsel for Mr. Pigram in the above titled action.  I have worked on this matter extensively; therefore, I am fully familiar with the facts set forth herein.

        2.      I submit this declaration in support of the defendant's Motion to Release the Grand Jury Minutes pursuant to Rule 6(e) and Motion to Compel Discovery, to wit: a video of the incident recorded by a police air patrol unit.

### Facts

        3.      On June 4, 2020, an indictment was filed in this Court charging the defendant as well as co-defendants Deyanna Davis and Walter Stewart with a violation of 18 USC § 922(g)(1) (felon in possession) and 18 USC § 2 (aiding and abetting).  The charges stem from an

incident on June 1, 2020.  According to prosecutors[1], at approximately 9:30pm, protestors began to gather in front of the Buffalo Police's E-District Headquarters Building located on Bailey Avenue in between Hempstead Avenue and Langfield Drive.  In response to the protest, Buffalo Police Officers and New York State Policemen (outfitted in riot and tactical gear) formed a police-line to separate protesters from the E-District Building.  Approximately 1-2 blocks from the building, a vehicle, operated by co-defendant Deyanna Davis, parked near a bus.

4. As officers advanced towards the protestors in an effort to disperse the crowd, a person was observed opening the rear-passenger door of Ms. Davis' car and firing 8-10 shots into the air and ground.  The identity of the person who opened the door and allegedly fired a weapon could not be ascertained.[2]  Thereafter, the door of the vehicle closed and Ms. Davis' vehicle advanced towards the police line on Bailey Avenue.

5. When Ms. Davis' vehicle reached the police line, the car did not stop.  Upon information and belief, Ms. Davis drove her car through a police line on Bailey Avenue.  The car hit three officers, injuring one officer seriously.  Thereafter, the car continued moving down Bailey Avenue and then Connelly Avenue at a high rate of speed.  At some point, police officers opened fire on the vehicle.  Upon information and belief, at least two rounds penetrated the windshield of the vehicle, striking Ms. Davis and Mr. Stewart.

---

[1] Many of the facts regarding the events that led up to Mr. Pigram's arrest are based on a proffer made by the government on June 18, 2020, in support of its motion to detain all defendants in this matter.

[2] Upon information and belief, the opening of the door and the firing of a gun were observed by an air patrol unit using an infrared camera (it was night and it was dark).  Upon information and belief, counsel for Ms. Davis was granted an opportunity to view the video that depicted this incident.  The defense requested a copy of this video prior to filing this motion, but the government refused to disclose it to the defense until *after* the detention hearing is conducted.

6.      Police chased Ms. Davis' vehicle.  After a short chase, the car was stopped by the police.  According to prosecutors, Mr. Pigram "crawled across" the front seat that Mr. Stewart was sitting in and ran from the scene.  Ms. Davis and Mr. Stewart remained in the vehicle.  Ms. Davis occupied the driver's seat.  Mr. Stewart occupied the front passenger seat.  Mr. Pigram ran across Route 33 and was apprehended by officers at an embankment.[3]

7.      After Ms. Davis, Mr. Stewart, and Mr. Pigram were taken into custody, police searched the vehicle and found a Smith & Wesson 9mm handgun and spent shell casings.  The handgun was located on the floor behind the driver's seat.  The shell casings were found in the car and on the roof of the car.  Upon information and belief, further investigation found several other spent 9mm shell casings on Bailey Avenue in the vicinity of the police line.  According to prosecutors, the shell casings in the vehicle and on the street match the Smith & Wesson handgun found in the vehicle.

8.      The Smith & Wesson handgun was seized as evidence and submitted for forensic testing.  On June 4, 2020 – the same day this case was indicted by the grand jury - testing *was commenced* on the weapon by Jodi Luedemann, a Forensic Biologist employed by the Erie County Central Police Services Forensic Laboratory ("ECCPS") in Buffalo, New York.  Ms. Luedemann attempted to extract DNA from the handgun.  She *completed* her testing and wrote a report on June 10, 2020, *six days after the indictment in this case*.[4]

---

[3] According to prosecutors, the video from the police air patrol unit depicts the stopping of the car and apprehension of Mr. Pigram.
[4] The results of the DNA report are irrelevant for purposes of this motion because Ms. Luedemann's findings were never presented to the grand jury.

9. Following his arrest, Mr. Pigram was transported to a police building for the purpose of conducting a custodial interrogation. During the interrogation, Mr. Pigram indicated that he was intoxicated because he had been drinking for several hours while mourning the death of a loved one. Upon information and belief, police asked Mr. Pigram whether he recalled the incident. He stated that he did not. Upon information and belief, police stated that a handgun was found in the car, however they *did not* ask Mr. Pigram whether the Smith & Wesson was his or whether he possessed the Smith & Wesson. Mr. Pigram *did not* admit to possessing a weapon during the interrogation. After approximately 45 minutes, police ceased their questioning of Mr. Pigram. Thereafter, Mr. Pigram was charged in New York State with Criminal Possession of a Weapon based on Mr. Pigram's status as a convicted felon and his status as an occupant of the vehicle.[5]

10. On June 17, 2020, your deponent was told by prosecutors that it was the belief of law enforcement that Ms. Davis was shot at least once by a gun that was discharged inside her car and that the Smith & Wesson 9mm was the weapon police suspected shot her. Upon information and belief, prosecutors have since disavowed this theory, but it is unknown why.

11. Upon information and belief, no law enforcement officer or lay witness observed Mr. Pigram possess the Smith & Wesson found in Ms. Davis' car. Upon information and belief, Mr. Pigram was not tested for gun shot residue to help establish that he recently fired a gun.

---

[5] Under New York law, when a firearm is found in a privately-owned vehicle and the firearm is not on the person of one of the occupants, there is a presumption that *all* occupants of the vehicle possessed the firearm. *See* NY Penal Law § 265.15(3) ("The presence in an automobile, other than a stolen one or a public omnibus, of any firearm . . . is presumptive evidence of its possession by all persons occupying such automobile at the time such weapon . . . is found, except under the following circumstances: (a) if such weapon . . . is found upon the person of one of the occupants therein . . . ."). This presumption *does not* exist under federal law.

**Mr. Pigram's Charge in the Indictment**

12.     Under Count 2 of the Indictment (Dkt. 1), Mr. Pigram is charged with a violation of 18 USC § 922(g)(1) and 924(a)(2), otherwise known as the "felon in possession" statute. The elements of the offense are as follows: 1) the defendant was convicted of a felony offense (i.e., a crime punishable by a term of imprisonment of more than one year); 2) following the conviction, the defendant knowingly possessed a firearm; 3) the defendant knew he belonged to the relevant category of persons barred from possessing a firearm; 4) the firearm was in or affecting interstate or foreign commerce.  *See* 18 USC § 922(g)(1) and 924(a)(2); *see also United States v. Miller,* 954 F.3d 551, 557-59 (2d Cir. 2020).

13.     The second element of the offense – "knowing possession" of a firearm – requires proof that the defendant possessed the firearm.  "Possession" within the meaning of § 922(g)(1) may be "actual" or "constructive."  *See United States v. Gaines*, 295 F.3d 293, 300 (2d Cir. 2002). "[A]ctual possession, requires the government to show defendant physically possessed the firearm." *See id.*  "[C]onstructive possession, exists when a person has the power and intention to exercise dominion and control over an object, [which] may be shown by direct or circumstantial evidence."  *Id.* (internal quotation marks omitted).  The government may show that a defendant exercised dominion and control over an object by demonstrating that "the defendant exercised dominion and control over the premises [or place] in which the firearms are located."  *United States v. Dhinsa*, 243 F.3d 635, 676 (2d Cir. 2001).

14.     Finally, the government also charged Mr. Pigram under an "aiding and abetting theory," *see* 18 USC § 2, however, as charged, the indictment speaks to Mr. Pigram "aiding and abetting" *himself* rather than aiding and abetting *another person.*  On its face, this theory of liability

appears to be defective as charged since a "principal" cannot "aid and abet" himself as a matter of law.

### Mr. Pigram has Concerns Regarding how the Indictment was Procured

15. Mr. Pigram is charged federally with the identical offense he is charged with in New York State: being a felon in possession of a firearm. However, unlike in New York, federal law does not provide for a statutory presumption that a person "knowingly possesses" a firearm simply because he is an occupant of a vehicle in which a firearm is found. *See infra*, note 5. Instead, for an indictment to proceed for a violation of § 922(g)(1), the evidence presented to the grand jury must establish that the charged defendant possessed the firearm "actually" or "constructively."

16. On June 4, 2020, forensic DNA testing of the Smith & Wesson was not complete, so DNA evidence that may tend to show possession was not presented to the grand jury. Upon information and belief, no officers or other witness saw Mr. Pigram in possession of the Smith & Wesson, so eyewitness testimony was not presented to the grand jury. Upon information and belief, Mr. Pigram was not tested for GSR, so that evidence was not presented to the grand jury. And the vehicle was Ms. Davis' car and driven by her – not Mr. Pigram – so the grand jury could not have been presented evidence that Mr. Pigram exercised dominion and control of the car to establish "constructive possession." Moreover, Mr. Pigram *was not asked* by police whether he possessed the Smith & Wesson found in the vehicle, so the grand jury was not presented evidence of an admission of guilt. In fact, upon information and belief, neither Ms. Davis nor Mr. Stewart made an inculpatory statement regarding their own possession of the Smith & Wesson or made a statement regarding Mr. Pigram's alleged possession of the Smith & Wesson, so the grand jury was not presented that type of evidence to help show probable cause on the "knowing possession"

element of the offense.[6]  The absence of all of these facts raises questions regarding how probable cause was established on the "knowing possession" element vis-à-vis Mr. Pigram and his co-defendants as well as the instructions that were given to the grand jury.

17.    There also is the issue of the "aiding and abetting" allegation.  As alleged in the indictment, Mr. Pigram (just like his codefendants) is charged with aiding and abetting *his own* alleged misconduct.  Since this is legally impossible, Mr. Pigram also has concerns regarding what instructions were provided to the grand jury to explain probable cause under 18 USC § 2.

**The Court should Authorize Disclosure of the Grand Jury Minutes and Instructions that discuss "knowing possession" and "aiding and abetting"**

18.    Federal Rule of Criminal Procedure 6(e)(2) states that matters presented to grand jury should remain secret.  Rule 6(e)(2) codifies a tradition of secrecy that is older than our nation.  *See Craig v. United States (In re Craig)*, 131 F.3d 99, 101 (2d Cir. 1997) (citations omitted).  As explained by the Second Circuit, "[t]he rule of secrecy has been justified by the important ways in which it is said to contribute to the success of grand juries and to the protection of those who appear before them."  *Id.* at 101-02.  Some of those purposes noted by the Second Circuit in *Craig* include: 1) insuring "the utmost freedom to the grand jury in its deliberations and to prevent persons subject to indictment or their friends from importuning the grand jurors," 2) "to encourage the free and untrammeled disclosures by persons who have information with respect to the commission of crimes," and 3) "to protect [the] innocent accused who is exonerated from disclosure of the fact that he had been under investigation . . . ." *Id.* (quoting *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681-82 n.6 (1958)).

---

[6] This is precisely why all three defendants were charged separately for this offense in state and in federal court.  Simply put, on June 4, 2020, the police were unsure who possessed the Smith & Wesson.

19. Notwithstanding the tradition of secrecy, the general rule of secrecy is not absolute. *Craig*, 131 F.3d at 103. Under Rule 6(e)(3)(E)(ii), the court may authorize the disclosure of a Grand Jury matter at the request of the defense who shows that a ground may exist to dismiss the Indictment because of a matter that occurred before the Grand Jury. The Court may authorize this disclosure "at a time, in a manner, and subject to any other conditions that it directs." *Id.*

20. Since "a presumption of regularity attaches to grand jury proceedings. . . .", *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994), "a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." *United States v. Forde*, 740 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (citing *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)); *see also Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S. Ct. 1237, 3 L. Ed. 2d 1323 (1959) ("The burden . . . is on the defense to show that a 'particularized need' exists for the minutes which outweighs the policy of secrecy."). "A [defendant] makes a showing of particularized need by proving 'that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.'" *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996) (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222, 99 S. Ct. 1667, 60 L. Ed. 2d 156 (1979)). This requirement "'extends to legal instructions given to the grand jury.'" *United States v. Hoey*, No. S3 11-cr-337 (PKC), 2014 U.S. Dist. LEXIS 91093, at *7-8 (S.D.N.Y. July 2, 2014) (quoting *United States v. Jailall*, No. 00 Cr 069 (RWS), 2000 U.S. Dist. LEXIS 13733, at *4 (S.D.N.Y. Sept. 22, 2000), *aff'd*, 23 F. App'x 94 (2d Cir. 2002)).

21. Here, Mr. Pigram has shown a "particularized need" for the grand jury minutes that is limited in scope and outweighs the necessity of secrecy. Mr. Pigram has asked this court to disclose 1) testimony and evidence presented to the grand jury regarding the element of "knowing possession" and "aiding and abetting" and 2) the legal instructions provided to the grand jury regarding those elements/theories of liability. Provision of these materials is necessary to defend against an injustice, to wit: the seemingly defective manner in which the indictment was procured.

22. As set forth above, the evidence regarding the "knowing possession" element was exceedingly weak on June 4, 2020. This is why federal prosecutors, just like New York State officials, charged all three occupants of Ms. Davis' car with this offense rather than charging one of them with the offense. However, unlike in New York, there is no statutory presumption upon which to show probable cause for the "knowing possession" element in federal court, so simply being in the car is not enough. Instead, federal prosecutors needed to present evidence to the grand jury demonstrating "actual" or "constructive" possession. It is completely unclear how this was established based upon the discovery provided to the defense, open-source materials in the news, and the government's detention proffer.

23. Making matters worse, the government's proffer regarding detention was replete with statements regarding protests outside of the police station past curfew and Ms. Davis' car running through the police line and injuring three officers. Conspicuously absent from the government's proffer was discussion regarding the offense charged in this case – being a felon in possession of a firearm – and why probable cause exists to show that Mr. Pigram (and his co-defendants) committed this offense. This should cause this Court to exercise some skepticism. As

we know, the indictment in this case was procured in the wake of public statements made by Attorney General Barr and President Trump calling for "law and order" and federal prosecution of protestors who violated the law.[7]  Following the events of June 1, 2020, New York authorities quickly charged all three defendants in this case with being a felon in possession.  Then, three days later, U.S. Attorney J.P. Kennedy chose to levy the *same* charges in federal court when there was no indication that 1) Mr. Pigram or his codefendant's are "outside agitators," 2) New York is planning to drop the felon in possession charge, or 3) there is a "substantial" federal interest that is not being vindicated by the New York prosecution.[8]  This decision should raise eyebrows because it is abnormal and highly irregular.

24.     Simply put, this indictment reeks of politics. Given the facts of this case and the lack of facts known to law enforcement and federal prosecutors on June 4, 2020, this indictment looks like the proverbial "rush to judgment."  And if the government's detention proffer is indicative of the type of irrelevant hyperbole that was presented to the grand jury when securing this indictment, then it is not impossible to understand how grand jurors could misread instructions and vote to indict this case when "knowing possession" was lacking and "aiding and abetting" oneself is impossible.

---

[7] *See, e.g.,* DOJ Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, May 31, 2020, available at: https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism (last accessed: Jun. 20, 2020).  Caitlyn Oprysko, *Trump Threatens to End Protests with Military*, POLITICO, Jun. 1, 2020, available at: https://www.politico.com/news/2020/06/01/trump-slams-governors-as-weak-crackdown-on-protests-294023 (last accessed: June 20, 2020).

[8] Of course, this prosecution does not raise double jeopardy concerns, but it is suspicious given how this quick indictment contradicts the Justice Department's *Petite* policy governing dual prosecutions. *See* U.S. Attorney's Manual § 9-2.031, available at: https://www.justice.gov/jm/jm-9-2000-authority-us-attorney-criminal-division-mattersprior-approvals#9-2.031 (last accessed: Jun. 21, 2020).

25.     Provision of the requested materials will assist the defense with proving why this indictment is irregular.  Possession of this information is necessary for a successful motion to dismiss the indictment.  The request is not overbroad – it is focused on one element of the crime/theory of liability and the instructions provided regarding the element/theory of liability.  If the government procured this indictment improperly or the grand jury voted on the indictment improperly, then the interest in secrecy should give way to protecting the accused against an unfounded charge.  Furthermore, it appears that the only persons who testified before the grand jury were police officers who investigated this case.  Those officials should not have the same concerns over secrecy that private citizens have.  For these reasons, the Court should grant Mr. Pigram's request and disclose these materials.

**The Court should Order the Government to Disclose
the Aerial Surveillance Video to Mr. Pigram**

26.     On June 19, 2020, the government refused the defendant's request to disclose the aerial surveillance video that it claimed in its detention proffer shows a passenger in Ms. Davis' car (allegedly Mr. Pigram) exiting the car and firing 8-10 shots into the air/ground.  Upon information and belief, the video was disclosed to Sam Davis, Esq., by New York State authorities at some point since June 2, 2020.  Mr. Davis reported that his inspection of the video may contradict what the government proffered last week, but your deponent is unable to confirm this without viewing the video himself.  Notwithstanding how this evidence could prove critical at a detention hearing or in understanding how law enforcement came to target Mr. Pigram, the government has refused to disclose the video to the defense even through it possesses the video and state prosecutors provided it to Mr. Davis previously.  The Court should order this video disclosed.

**Conclusion**

27. This indictment is beset with irregularities that cannot be explained. The Court should help resolve these serious questions by permitting the defense to inspect the grand jury materials and instructions. Furthermore, the Court should order the government to disclose the video taken by the air patrol unit.

Dated: June 22, 2020
Williamsville, New York

**SINGER LEGAL PLLC**
*Attorneys for Defendant Semaj Pigram*

By:\_\_\_\_s/ Robert C. Singer, Esq._____
Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York  14221
(716) 222-3288
rob@singerlegalpllc.com